IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

C&C INTERNATIONAL TRADING COMPANY                    PLAINTIFF
d/b/a Chefs Trading

v.                          Case No. 4:20-cv-00415-LPR

BUCKHEAD MEAT COMPANY
d/b/a Trinity Seafood                                DEFENDANT

<u>ORDER</u>

Before the Court is a Motion to Dismiss[1] filed by Defendant Buckhead Meat Company d/b/a Trinity Seafood ("Trinity").  For the reasons stated below, the Motion is GRANTED.

BACKGROUND[2]

Plaintiff C&C International Trading Company d/b/a Chefs Trading ("Chefs Trading") runs chefstrading.com, "an online platform and service to facilitate the direct sales of aquatic products between sellers and buyers."[3]  "Chefs Trading sources fresh fish," including tuna, "from fishermen in South and Central America and other locations, and specifically Costa Rica."[4]  Chefs Trading says that it "provides the sales face for Costa Rican fisherman looking to do business in the United States."[5]

---

[1] Def.'s Mot. to Dismiss (Doc. 16).

[2] Because this case is at the Motion to Dismiss stage, the "facts" set forth in this Background section are drawn from the allegations in the Amended Complaint.  Accordingly, if this case were to progress to subsequent stages, the "facts" may change significantly.

[3] Pl.'s Am. Compl. (Doc. 15) at 3.

[4] *Id.*

[5] *Id.*  Part of Chefs Trading's role is "ensur[ing] compliance with the Food and Drug Administration ('FDA') for all aquatic imports from sellers with whom it does business in Costa Rica."  *Id.* at 4-5.  Buyers in the United States "rely on Chefs Trading as the provider and/or importing source of Costa Rican tuna to meet" FDA requirements.  *Id.* at 5.

This case is about the sale of socially-conscious fish.  Chefs Trading has a relationship with one of only two "Fishery Improvement Project" ("FIP") certified fish processing plants in Costa Rica, and Chefs Trading "is one of only two providers/importers recognized by, and who financially sponsors and contributes to, the Costa Rican FIP and is known as the 'Costa Rican FIP Market Group.'"[6]  According to Chefs Trading, "[f]air trade, sustainability of products and proper chain of custody provided by sellers of tuna and seafood products from foreign countries, including Costa Rica, has a value in the marketplace."[7]  Chefs Trading states that "[l]arge United States retailers and other Fortune 500 companies who are socially conscious, including but not limited to Wegmans, Marriott and Aramark, will only buy tuna from a FIP-certified provider/sponsor/importer."[8]

According to Chefs Trading, in order to capitalize on the demand for FIP-certified fish, "Chefs Trading's reputation and good will as one of two sources of Costa Rican FIP-certified tuna in the United States must be maintained and recognized to ensure that what is represented as the geographic point of origin of the tuna is true and accurate."[9]  To this end, Chefs Trading requires sellers of seafood on its platform to participate in Chefs Trading's "catch traceability tagging program."[10]  The program requires sellers to "provide CT with accurate identification of the [fish] species name and common name, manner of harvest, name of the harvesting vessel and captain, and google map link identifying the approximate location caught/harvested," and to attach a "tracing tag to the lip, fin or gill of each applicable fish."[11]

---

[6] *Id.* at 3-4.

[7] *Id.* at 4.

[8] *Id.*

[9] *Id.*

[10] *Id.* at 7.

[11] *Id.* at 26.

Eight tags are placed on each fish, and each tag has a QR code.[12]  "Chefs Trading pays for the CT Tags and ensures that its small fish houses and suppliers in South and Central America have those tags in place to carry out their contractual obligations."[13]  Chefs Trading says that it requires its tags to be placed on the fish "[i]n order to ensure proper chain of custody and traceability to validate the point of origin of tuna from a Costa Rican FIP-certified processing plant and the quality of the fish."[14]  The tags are "also designed to ensure traceability of the fish to its geographic point of origin to guard against counterfeiting by buyers who pawn off tuna in the marketplace as being from a FIP-certified facility, when, in fact, such tuna comes from a non-FIP-certified facility."[15]

Trinity "is a sophisticated business with years of experience in the sourcing, purchasing and selling of seafood and other food items in multiple States."[16]  After being introduced to Charles Dawn, the President of Chefs Trading, Trinity became a customer of Chefs Trading.[17]  On June 18, 2015 at 10:14 a.m., Mr. Shaun Garrity of Trinity created an account and electronically signed a contract on chefstrading.com.[18]  The Contract between Chefs Trading and Trinity includes the following relevant provisions:

**TERMS AND CONDITIONS OF USE**

C&C International Trading Company DBA Chefs Trading (hereinafter "CT") developed ChefsTrading.com as an online platform to allow direct sales of aquatic products such as seafood ("Product") between sellers and buyers, facilitated by CT as the import/customs clearance agent. In general, a seller authorized by CT ("Seller") may post Product prices (in U.S. dollars) and quantities (in U.S. pounds)

---

[12] *Id.* at 14.

[13] *Id.*

[14] *Id.* at 5.

[15] *Id.*

[16] *Id.* at 3.

[17] *Id.* at 6.

[18] *Id.*

on the Seller portal of CT's website, for each species identified by the Seller, thereby committing to sell such Product to the buyer(s) authorized by CT ("Buyer"). . . .  A Buyer may submit a purchase order (or other request for Product, collectively "Purchase Order") to CT, and CT will provide a written/electronic and/or verbal Purchase Request Confirmation to such Buyer to confirm that the purchase of such Product on Buyer's behalf will be immediately undertaken on Buyer's behalf (or is underway); any Purchase Order and consequent Purchase Request Confirmation will constitute an agreement between the Buyer and CT, for CT's good faith pursuit of the purchase of the Product identified therein on the Buyer's behalf, and the terms of CT's Purchase Request Confirmation will govern if there is any discrepancy with the Buyer's Purchase Order.[19]

CT will also send a Sale Request Confirmation to one or more Seller to purchase the Product on the Buyer's behalf, in the quantity and quality identified in the Purchase Request Confirmation; and such Seller(s) may submit to CT an Invoice (or other transaction memorandum, collectively "Invoice") confirming such sale commitment to CT on behalf of a Buyer.  Any identification of CT as the purchaser, consignee or other participant at any stage of any transaction will be purely to facilitate CT's functioning as purchasing agent on behalf of a Buyer, and for Product importation, Product customs clearance and any other regulatory approval, transit monitoring and transaction administration (collective "Service"). . . .[20]

\*\*\*

. . . Neither Seller nor Buyer has an recourse against CT for any liability or loss whatsoever except liability or loss proximately caused by the acts or omissions of CT or any of its agents in connection with Product importation, Product customs clearance and any other regulatory approval required for entry into the United States.[21]

\*\*\*

3. SELLER'S DUTIES: (a) Seller will: . . .

\*\*\*

(4) For participation in CT's catch traceability tagging program, for each fish harvested provide CT with accurate identification of the species name and common name, manner of harvest, name of the harvesting vessel and captain, and google map link identifying the approximate location caught/ harvested to the best of your ability; (A) Agree to enter correct and verifiable data after proper documentation and verifiable paperwork is obtained. (B) agree to use all equipment, materials, hardware and software provided by CT properly and only

---

[19] *Id.* at 24.

[20] *Id.*

[21] *Id.* at 25.

with CT thru CT for CT's Buyers as directed by CT. (C) agree to not reproduce, replicate or otherwise use CT's software or materials in any way or similar way for any purpose; (D) promptly upon receipt from CT, attach any tracing tag to the lip, fin or gill of each applicable fish or sticker label to each item of Product according to CT's specifications.[22]

\*\*\*

6. BUYER'S DUTIES: . . .

\*\*\*

(b) Buyer will not do any of the following:

(1) use, reproduce or replicate CT's name or any trademark, logo, advertising material, or tag or other tracing indicia, without the prior written approval of CT;

(2) open any Product package or use Product in any way until allowed by the FDA; or

(3) use the Website, Service, or CT's tags (or other tracing indicia) for any product or purpose other than in accordance with this Agreement.[23]

\*\*\*

12. USE OF THE WEBSITE AND SERVICE. . . .   Absent the prior written consent of CT, You will not access, reproduce, duplicate, copy, sell, re-sell, modify, distribute, transmit, or otherwise exploit the Website or Service, or any content thereof, for any purpose except for Your own use in accordance with this Agreement. . . .[24]

\*\*\*

24. INDEMNITY. . . .

\*\*\*

(b) LIMITATION OF LIABILITY. YOU EXPRESSLY UNDERSTAND AND AGREE THAT CT, ITS OFFICERS, EMPLOYEES AND AGENTS WILL NOT BE LIABLE UNDER CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE OR ANY OTHER LEGAL THEORY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, COMPENSATORY,

---

[22] *Id.* at 26.

[23] *Id.* at 27-28.

[24] *Id.* at 28.

CONSEQUENTIAL OR EXEMPLARY DAMAGES (EVEN IF CT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) (COLLECTIVELY, "DAMAGES"), WITH RESPECT TO THE WEBSITE AND SERVICE, INCLUDING, BUT NOT LIMITED TO: (A) THE USE OR INABILITY TO USE THE SITE AND SERVICE; (B) THE COST OF ANY GOODS AND/OR SERVICE PURCHASED OR OBTAINED AS A RESULT OF THE USE OF THE WEBSITE OR SERVICE; (C) DISCLOSURE OF, UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS, DATA, INFORMATION, OR CONTENT; (D) CONTENT YOU SUBMIT, RECEIVE, ACCESS, TRANSMIT OR OTHERWISE CONVEY THROUGH THE WEBSITE OR SERVICE; (E) STATEMENTS OR CONDUCT OF ANY SERVICE PROVIDER OR OTHER THIRD PARTY IN CONNECTION WITH OR THROUGH THE WEBSITE OR SERVICE; (F) ANY OTHER MATTER RELATING TO THE WEBSITE AND/OR SERVICE; OR (G) ANY BREACH OF THIS AGREEMENT BY CT OR THE FAILURE OF CT TO PROVIDE THE SERVICE. TO THE EXTENT CT, ITS OFFICERS, EMPLOYEES AND AGENTS ARE FOUND LIABLE FOR ANY DIRECT DAMAGES RELATED TO THIS AGREEMENT OR THE USE OF THE WEBSITE AND SERVICE, LIABILITY FOR DAMAGES SHALL NOT EXCEED $100 IN THE AGGREGATE. THESE LIMITATIONS SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW.[25]

\*\*\*

22. NOTICE. . . .[26]

\*\*\*

(c) GOVERNING LAW. Any dispute or other controversy arising out of or relating to this Agreement must be adjudicated by the first-initiated . . . court proceeding administered in Little Rock, Arkansas. This Agreement and the relationship between You and CT will be governed by the laws of the State of Arkansas, notwithstanding the choice of law provisions of the venue where any action is brought, where the violation occurred, where You may be located or any other jurisdiction. You agree and consent to the exclusive jurisdiction of the state or federal courts located in Little Rock, Arkansas and waive any defense of lack of personal jurisdiction or improper venue or forum non conveniens to a claim brought in such court, except that CT may elect, in its sole discretion, to litigate the action in the county or state where any breach by You occurred or where You can be found. You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out or related

---

[25] *Id.* at 35.

[26] According to the Amended Complaint, this paragraph was "mislabeled as 22" and is actually Paragraph 26. *Id.* at 9.

to Your use of the Website or Service or this Agreement shall be filed within one (1) year after such claim or cause of action arose or will forever be barred.[27]

(d) MISCELLANEOUS. If You breach any term of this Agreement or other agreement with CT, CT may pursue any legal or equitable remedy available, including (but not limited to) direct, consequential, and punitive damages and injunctive relief. CT's remedies are cumulative and not exclusive. Failure of CT to exercise any remedy or enforce any portion of this Agreement at any time shall not operate as a waiver of any remedy or of the right to enforce any portion of the Agreement at any time thereafter.  If any provision of this Agreement is found to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that the terms hereof shall otherwise remain in full force and effect and enforceable.[28]

Chefs Trading alleges that Trinity's "managers have been well aware of the importance of CT Tags for Chefs Trading's business, brand and the Fishery Improvement Projects ('FIP') outside of the United States, and the sustainability of the seafood that it sells."[29]  To emphasize this point, Chefs Trading's Amended Complaint discusses a "Trinity presentation for CT Tags" that was apparently given to Trinity's customers or potential customers.[30]  The presentation "was given by Trinity's Shaun Garrity on or about April 26, 2017, which include[d] photographs of the CT Tags and the following language":

Chefs Trading uses CT Tags which allows the consumer to verify that the fish came from a vetted and trusted fishery confirming the chain of sustainability. CT tags make tracing a product as easy as can be, all you need to do would be to take one of the tags with a QR code and scan it using your phone or tablet to see the fishery and the catch. This process reassures that you are receiving fresh, quality seafood.[31]

Chefs Trading alleges that Trinity "stated in its written presentations, referencing Chefs Trading":

We source the freshest wild-caught seafood . . . Upload, process and tag the order on the same day . . . Then we directly ship it to your local market . . . And expedite the fresh seafood straight to your restaurant/store . . . You can scan the QR code on the CT-Tag tag with any smart phone . . . The CT-Tag will pop up with the

---

[27] *Id.* at 36-37.

[28] *Id.* at 37.

[29] *Id.* at 10.

[30] *Id.*

[31] *Id.*

information including: the captain's name, the vessel used, the harvest method and the area the seafood was caught.[32]

Chefs Trading says that Trinity "further stated in its presentations: 'Chefs Trading's Technology allows fresh fish to be tagged Internationally at the receiving dock with a QR code that is designed to be passed down the supply chain all the way to the end user.'"[33]

Chefs Trading alleges that, "[d]espite its presentations demonstrating the importance of traceability and identity of Chefs Trading's CT Tags as important for the sale of FIP-certified tuna and other fish,"[34] Trinity's "managers have instructed their subordinate employees to rip off the CT Tags, and continue to do so, when a shipment is received through Chefs Trading's import and sourcing efforts from Costa Rica, among other countries."[35] It is not clear when exactly Trinity's management is alleged to have issued this directive, or when Chefs Trading discovered that the tags were being cut off the fish. However, Chefs Trading says it had numerous conversions with Trinity about the tracking tags. Specifically, "[t]hroughout 2018, various communications took place between Chris Wirges, CEO of Chefs Trading, and Trinity General Manager Michael Carson and others at Trinity to further discuss refinements to the tracking associated with the CT Tags and the importance for its FIP and sustainability programs."[36]

The tracking tag issue also arose in the context of refund requests. Chefs Trading explains that:

> In processing monetary credits to Trinity for returned fish on rare occasions, Charles Dwan has insisted that Trinity scan the CT Tags to ping off of the Trinity IP address and the QR Codes, showing that Trinity had the CT Tags in its facility

---

[32] *Id.* at 11.

[33] *Id.*

[34] *Id.*

[35] *Id.* at 10.

[36] *Id.* at 11-12.

and/or possession. The CT Tags and the ping process works successfully and has continued to work successfully since its inception.[37]

Chefs Trading states that "Mr. Dwan reminded Trinity officials – including General Manager Carson – on multiple occasions . . . of the contractual requirement to keep the CT Tags on the seafood for resale and to distribute them to the next buyer in the supply chain . . . ."[38] Chefs Trading recounts that "Mr. Dwan escalated the issue again on July 17, 2019 after being contacted by Shaun Garrity of Trinity to seek a credit for a tuna shipment that Defendant asserted was unacceptable."[39] After "Mr. Dwan learned that Defendant's employees were continuing to cut off the CT Tags," Mr. Dwan wrote Mr. Garrity the following message:

> Thank you, I've asked Chris [Wirges] to issue your credit.
>
> We negotiated with Evan [Stark] and Mike [Carson] not the cut room. Next time they hassle you tell them that there is a $100.00 penalty ($800.00 per fish) per tag that does not get to the consumer and that you guys signed way your rights to a trial and have to travel to A[R] to appear and show a judge why the cut guys just threw my branded IP in the trash even though the terms signed by Evan and Mike four years ago said they would pay the penalty for doing exactly that. I have no interest in poking that bear at this time but I should not have to waste this much of your time because the cut room.[40]

Despite these conversations, Chefs Trading states that Trinity's "scan rate for CT Tags back to Chefs Trading has and continues to remain at zero percent (0%)."[41]

On August 27, 2019, Charles Dwan spoke with Michael Carson and sent Mr. Carson a follow up email "to right the ship and call for a return to normal order."[42]  A copy of the Contract

---

[37] *Id.* at 12.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.* at 13.  The Amended Complaint does not explain what the "scan rate" means in this context.  The Court presumes that it refers to the rate at which either Trinity or Trinity's customers scanned the QR codes attached to the fish.

[42] *Id.*

was attached to the email.[43]  Chefs Trading says that approximately three weeks later, Mr. Dwan emailed Mr. Carson "per Mr. Carson's request" to provide Trinity's scan rate of QR codes on the tags, and the email stated that "the scan rate was still zero."[44]  "Approximately five weeks later on October 30, 2019, Mr. Dwan emailed Mr. Carson again to advise that Trinity's scan rates had not changed and were still zero."[45]

On April 16, 2020, Chefs Trading filed an Original Complaint initiating this lawsuit.[46]  On May 22, 2020, Chefs Trading filed an Amended Complaint.[47]  The Amended Complaint asserts four claims:

1. Trinity's removal of Chef Trading's tracing tags "constitutes unfair competition under §43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by making false designations of Plaintiff's trademarked CT Tags as Defendant'[s] own for a commercial purpose and/or falsely designating services, sponsorship and origin of Chefs Trading's sourced seafood."[48]

2. Trinity's "misconduct alleged herein constitutes unfair competition under Arkansas common law."[49]

3. Trinity "breached the Contract by cutting off the CT Tags."[50]

4. Trinity "retained the benefit of Plaintiff's efforts and expense for producing and/or providing the CT Tag for Defendant'[s] use during the life of the Contract by, among other ways, not adhering to attaching, re-attaching and/or distributing CT Tags to Defendant'[s] customers down the supply chain after a resale of the seafood," and the "retention of those benefits" constitutes unjust enrichment.[51]

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] Pl.'s Compl. (Doc. 1).

[47] Pl.'s Am. Compl. (Doc. 15).

[48] *Id.* at 17.

[49] *Id.* at 18.

[50] *Id.* at 20.

[51] *Id.* at 21-22.

On June 4, 2020, Trinity filed the instant Motion to Dismiss.[52]

## DISCUSSION

To survive a motion to dismiss, a complaint must state a viable cause of action; that is, the complaint must allege facts that, if true, "show[] that the pleader is entitled to relief."[53]   In evaluating the sufficiency of a complaint, the Court assumes that "all factual allegations in the pleadings are true and interpret[s] them in the light most favorable to the nonmoving party."[54] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has . . . not 'show[n]' . . .  that the pleader is entitled to relief," and the Court will dismiss the complaint.[55]

Trinity makes a wide variety of arguments in favor of dismissal.   Several of Trinity's arguments are intertwined with and based on Trinity's position that the Contract is invalid and unenforceable.   Accordingly, that seems like a good place to start.

### 1. Is the Contract valid and enforceable?

"In Arkansas, the essential elements of a contract are: (1) competent parties; (2) subject matter; (3) consideration; (4) mutual agreement; and (5) mutual obligations."[56]   Trinity argues that the Terms of Use Contract "is invalid and unenforceable for lack of mutuality of obligation."[57] Trinity asserts that "the Terms of Use impose numerous requirements upon 'Buyers' and

---

[52] Def.'s Mot. to Dismiss (Doc. 16).

[53] FED. R. CIV. P. 8(a)(2).

[54] *Bell v. Pfizer, Inc.*, 716 F.3d 1087, 1091 (8th Cir. 2013) (citations and internal quotation omitted).

[55] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting FED. R. CIV. P. 8(a)(2)).   The Court will "interpret Arkansas law in determining whether the elements" of a state law claim have been pled.   *Bell*, 716 F.3d at 1091 (citations and internal quotation omitted).

[56] *Jorja Trading, Inc. v. Willis*, 2020 Ark. 133, at 4, 598 S.W.3d 1, 5 (citing *City of Dardanelle v. City of Russellville*, 372 Ark. 486, 491, 277 S.W.3d 562, 565–566 (2008)).

[57] Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 17) at 7.

'Sellers,'" but "no similar obligations are imposed upon" Chefs Trading.[58]  Trinity also argues that even "if there were any possibility that Plaintiff could be held responsible for some unidentified act or omission under the Terms of Use, the repeated disclaimers of liability make clear that Plaintiff rejects all obligations that may be imposed upon it."[59]

The Contract does not lack mutuality of obligation.  The Arkansas Supreme Court has explained that "mutuality of contract means that an obligation must rest on each party to do or permit to be done something in consideration of the act or promise of the other; thus, neither party is bound unless both are bound."[60]  So, "[a] contract . . . that leaves it entirely optional with one of the parties as to whether or not he will perform his promise would not be binding on the other."[61] That's not the situation we have here.  The Contract clearly sets forth the roles and obligations of the parties to the Contract, including Chefs Trading's role and obligations. Chefs Trading's responsibilities are not illusory:

- The Contract states that Chefs Trading "developed ChefsTrading.com as an online platform to allow direct sales of aquatic products such as seafood ('Product') between sellers and buyers, <u>facilitated by CT as the import/customs clearance agent</u>."[62]

- Under the Contract, a buyer such as Trinity is authorized to access and use Chefs Trading's website to make purchases.[63]

- The Contract provides that when a buyer such as Trinity submits a purchase order on the website, Chefs Trading "_will_ provide a written/electronic and/or verbal Purchase Request Confirmation to such Buyer to confirm that the purchase of such Product on Buyer's behalf _will_ be immediately undertaken _on Buyer's behalf_ (or is underway)."[64]

---

[58] _Id._ at 8.

[59] _Id._ at 9.

[60] _Indep. Cty. v. City of Clarksville_, 2012 Ark. 17, at 6, 386 S.W.3d 395, 399 (citation omitted).

[61] _Id._ (citation omitted).

[62] Pl.'s Am. Compl. (Doc. 15) at 24 (emphasis added).

[63] _Id._ at 27.

[64] _Id._ at 24 (emphasis added).

- The Contract provides that "any Purchase Order and consequent Purchase Request Confirmation <u>will</u> constitute an agreement between the Buyer and CT, <u>for CT's good faith pursuit of the purchase of the Product identified therein on the Buyer's behalf</u>."[65]  It further provides that Chefs Trading "<u>will</u> also send a Sale Request Confirmation to one or more Seller to purchase the Product <u>on the Buyer's behalf</u>, in the quantity and quality identified in the Purchase Request Confirmation."[66]

- As Chefs Trading notes, the Contract explicitly provides that a buyer like Trinity shall have recourse against Chefs Trading for "liability or loss proximately <u>caused by the acts or omissions of CT or any of its agents</u> in connection with Product importation, Product customs clearance and any other regulatory approval required for entry into the United States."[67]

Trinity emphasizes its view that any theoretical mutuality of obligation is eliminated by Paragraph 24(b) of the Contract, which very significantly limits Chefs Trading's liability.[68]  It is true that that Arkansas Supreme Court has often said that Arkansas law "requires that the terms of the agreement 'impose real liability upon [the] parties.'"[69]  That is because "a contract that provides one party the option not to perform his promise would not be binding on the other."[70]  However, the Arkansas Supreme Court has recently emphasized that "[u]nder . . . state-contract precedent, mutuality of obligation does not require a precisely even exchange of identical rights and obligations between the contracting parties."[71]  Rather, "'[i]t is enough that the duty unconditionally undertaken by each party be regarded by the law as a sufficient consideration for

---

[65] *Id.* (emphasis added).

[66] *Id.* (emphasis added).

[67] *Id.* at 25 (emphasis added).

[68] Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 17) at 8-9; Pl.'s Am. Compl. (Doc. 15) at 35.

[69] *Jorja Trading*, 2020 Ark. 133, at 4, 598 S.W.3d at 5 (quoting *Independence Cty.*, 2012 Ark. 17, at 7, 386 S.W.3d at 399).

[70] *Id.* at 5, 598 S.W.3d at 5 (citing *City of Dardanelle v. City of Russellville*, 372 Ark. 486, 491, 277 S.W.3d 562, 566 (2008)).

[71] *Id.* at 6, 598 S.W.3d at 6 (citing *Lindner v. Mid-Continent Petroleum Corp.*, 221 Ark. 241, 252 S.W.2d 631 (1952); *Johnson v. Johnson*, 188 Ark. 992, 68 S.W.2d 465 (1934)).

the other's promise.'"[72]   Moreover, "mutuality of obligations becomes a 'nonissue' when performance is given."[73]

In the case at bar, Chefs Trading has some liability risk for non-performance under the Contract, even if that liability is quite limited.  Moreover, at this stage of the proceedings, the Court must assume as true that Chef's Trading has actually been performing its contractual duties and obligations under the Contract with Trinity for years.  Trinity does not argue otherwise.  Finally, it is worth noting that the liability limitation provision only applies to the "extent permitted by law"[74] and that the Contract provides for severance of invalid provisions.[75]  In short, in the Court's view, Chefs Trading's very real obligations under the Contract are not made illusory by the liability limitations provision.  The Contract is valid and enforceable.

### 2.  What does this mean for unjust enrichment and personal jurisdiction?

Trinity argues that if "the Terms of Use is a valid contract, Plaintiff's claim for unjust enrichment must be dismissed."[76]  It points to an Arkansas Supreme Court case holding that "the concept of unjust enrichment has no application when an express written contract exists."[77]  Trinity is right.  Chefs Trading acknowledges as much in its brief opposing the Motion to Dismiss.  Chefs Trading says that its breach of contract and unjust enrichment are "mutually exclusive claims," and explains that it included the unjust enrichment claim because "alternative pleading of claims"

---

[72] *Id.* (quoting *Lindner*, 221 Ark. at 244, 252 S.W.2d at 632).

[73] *Town of Lead Hill v. Ozark Mountain Reg'l Pub. Water Auth. of State*, 2015 Ark. 360, at 19, 472 S.W.3d 118, 131 (quoting *Jordan v. Diamond Equipment & Supply Co.*, 362 Ark. 142, 153, 207 S.W.3d 525, 533 (2005)).

[74] Pl.'s Am. Compl. (Doc. 15) at 35.

[75] *Id.* at 37 ("If any provision of this Agreement is found to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that the terms hereof shall otherwise remain in full force and effect and enforceable.").

[76] Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 17) at 12 n.5.

[77] *Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 362 Ark. 598, 612, 210 S.W.3d 101, 112 (2005).

is permitted.[78]  As discussed above in Section 1, the Contract is valid.  And, as discussed below in Section 3, the Contract speaks to the duties of various actors with respect to the tags.  That's enough to preclude the viability of an unjust enrichment claim under Arkansas law.[79]

While the validity of the Contract works in favor of Trinity with respect to its unjust enrichment argument, it works against Trinity with respect to personal jurisdiction.  Chefs Trading states that this Court has jurisdiction because "the contract at issue specifies that the parties agree that a court in Little Rock, Arkansas shall be the proper venue and have jurisdiction over claims arising out of the contract."[80]  Chefs Trading thus argues that Trinity consented to personal jurisdiction in this Court, or at least pre-waived any objection to it.[81]  Trinity argues that the "[b]ecause the Terms of Use is entirely invalid and unenforceable . . . , the personal jurisdiction waiver contained therein is likewise invalid and unenforceable," and "[a]s a result, Trinity Seafood should be dismissed for lack of personal jurisdiction."[82]  This is Trinity's sole argument as it relates to personal jurisdiction.  The argument advanced by Trinity fails because the Court concludes that

---

[78] Pl.'s Resp. in Opp'n to Mot. to Dismiss (Doc. 18) at 13 n.6.

[79] This is not the only reason to dismiss the unjust enrichment claim.  Let's assume for a moment the Court had concluded that the Contract was invalid.  Or assume that, for some other reason, the unjust enrichment claim was not entirely foreclosed.  *See Campbell v. Asbury Auto., Inc.*, 2011 Ark. 157, at 23, 381 S.W.3d 21, 37 (quoting *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 786 (8th Cir. 1996)) ("[T]he mere existence of a contract between the parties does not automatically foreclose a claim of unjust enrichment. '[W]hen an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice.'").  In that situation, dismissal of the unjust enrichment claim is still the right outcome—for failure to state a claim.  Chefs Trading argues that Trinity "retained the benefit of Plaintiff's efforts and expense for producing and/or providing the CT Tag for Defendant'[s] use during the life of the Contract by, among other ways, not adhering to attaching, re-attaching and/or distributing CT Tags to Defendant'[s] customers down the supply chain after a resale of the seafood."  Pl.'s Am. Compl. (Doc. 15) at 21-22.  The Court is not persuaded that states an actionable unjust enrichment claim.  The Arkansas Supreme Court held that "[t]o find unjust enrichment, a party must have received something of value, to which he or she is not entitled and which he or she must restore."  *Hatchell v. Wren*, 363 Ark. 107, 117, 211 S.W.3d 516, 522 (2005).  Here, Trinity paid CT money and received a tagged fish.  It then used the fish.  It is unclear what Trinity received of value to which it was not entitled.

[80] Pl.'s Am. Compl. (Doc. 15) at 2.

[81] Pl.'s Resp. in Opp'n to Mot. to Dismiss (Doc. 18) at 13.

[82] Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 17) at 13.

the Contract is valid and enforceable.  And the Court is not authorized to advance arguments that Trinity did not raise.

### 3.  Has Chefs Trading stated a viable breach of contract claim?

Trinity argues that Chefs Trading "fails to allege any conduct by Trinity Seafood that would constitute a breach of [the Contract's] terms."[83]  Specifically, Trinity argues that "the Terms of Use imposes no duty, requirement, or obligation on a 'Buyer' like Trinity Seafood to participate in the traceability tagging program, keep any tracing tag attached to the seafood, use or scan the CT Tags at any point, or distribute the CT Tags to the next buyer in the supply chain."[84]

The following provisions are the only requirements that the Contract places on buyers like Trinity in relation to the tags:

> Buyer will not do any of the following:
>
> (1)     use, reproduce or replicate CT's name or any trademark, logo, advertising material, or tag or other tracing indicia, without the prior written approval of CT; . . .
>
> (3)     use the Website, Service, or CT's tags (or other tracing indicia) for any product or purpose other than in accordance with this Agreement.[85]

Under a plain language reading, neither provision requires Trinity to keep Chefs Trading's tags on the fish it buys.  And, in Arkansas, contracts are interpreted in accordance with their plain language.[86]  "When the parties express their intention in a contract in clear and unambiguous

---

[83] *Id.* at 14.

[84] *Id.* at 15.

[85] Pl.'s Am. Compl. (Doc. 15) at 28.

[86] *See, e.g., Perkins v. Cedar Mountain Sewer Imp. Dist. No. 43 of Garland Cty.*, 360 Ark. 50, 65, 199 S.W.3d 667, 677 (2004) ("[W]e give effect to the plain language of the contract.") (citations omitted); *S. Constr., LLC v. Horton*, 2020 Ark. App. 361, at 16, 609 S.W.3d 16, 26 ("When a contract is unambiguous, the circuit court applies the plain language of the parties' terms and determines as a matter of law how to apply the contract.") (citation omitted).

language, we must construe the written agreement according to its plain meaning."[87]  Moreover, any "ambiguities in a written contract are construed strictly against the drafter."[88]

Chefs Trading tries to make much of the provision that prohibits a buyer's "use" of the tags for any "purpose other than in accordance with this Agreement."[89]  The Contract, however, does not indicate any "purpose" of the tags apart from general references to "tracing."  Besides the two provisions listed above, the only other reference to the tags in the Contract is a provision requiring sellers to input data for the "catch traceability tagging program" and to attach the tags to their fish.[90]  Contrary to Chefs Trading's representations, there are no Contract provisions indicating that the "purpose" of the tag is to "demonstrate that the fish is FIP-certified," "guard against counterfeiting," or prevent "customer confusion."[91]  Even if there were, all that would establish is that Trinity was permitted to keep the tags on the fish; not that it was required to do so.[92]

### 4.  Has Chefs Trading stated a viable Lanham Act claim or state law-based unfair competition claim?

Trinity argues that Chefs Trading "failed to state a claim for unfair competition under the Lanham Act or Arkansas common law."[93]  Let's start with the Lanham Act.  The Lanham Act provides in relevant part that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device thereof, or

---

[87] *Jorja Trading*, 2020 Ark. 133, at 9, 598 S.W.3d at 7 (citation omitted).

[88] *Byme, Inc. v. Ivy*, 367 Ark. 451, 459, 241 S.W.3d 229, 236 (2006) (citation omitted).

[89] Pl.'s Am. Compl. (Doc. 15) at 20; Pl.'s Resp. in Opp'n to Mot. to Dismiss (Doc. 18) at 14.

[90] Pl.'s Am. Compl. (Doc. 15) at 26.

[91] Pl.'s Resp. in Opp'n to Mot. to Dismiss (Doc. 18) at 14-15.

[92] Chefs Trading argues that this conclusion ignores the pleaded facts in the Complaint.  But that's not accurate.  There are no facts pleaded in the Complaint that, if accepted as true, would show the contractual language means (or requires) anything more than what a plain reading of that language suggests it means (or requires).  Of course, the Court need not accept as true conclusory allegations.

[93] Def.'s Mot. to Dismiss (Doc. 16) at 1.

any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or he goods, services, or commercial activities by another person . . . shall be liable in a civil action . . . ."[94]

Chefs Trading's Amended Complaint alleges that removal of the tags violates the Lanham Act in a number of different ways.

*Inter alia*, the Amended Complaint alleges that "[r]emoval of Plaintiff's CT Tags constitutes a false designation of origin (that the seafood came from Defendant's and not Plaintiff's services), and removal misrepresents the geographic origin of the seafood (the place where each was caught), by removing that information from disclosure to the consumer."[95]  The Amended Complaint alleges that Trinity "has caused . . . consumer confusion as to the source, origin and/or sponsorship of the fish <u>and</u> the source or origin of the services provided by Chefs Trading in sourcing that fish."[96]  The Amended Complaint alleges that Chefs Trading, as the "originator and/or sponsor of the misidentified" fish, has been "deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the FIP-certified seafood product."[97]  The Amended Complaint alleges that Chefs Trading has been deprived "of the opportunity to develop, proliferate and grow its reputation as a FIP-certified importer/sourcing agent . . . ."[98]  The Amended Complaint alleges that Trinity has made "false designations of Plaintiff's trademarked CT Tags as Defendant' own . . . and/or falsely designat[ed]

---

[94] 15 U.S.C. § 1125(a)(1).

[95] Pl.'s Am. Compl. (Doc. 15) at 16.

[96] *Id.* (emphasis in original).

[97] *Id.*

[98] *Id.* at 17.

services, sponsorship and origin of Chefs Trading's sourced seafood."[99]   Finally, the Amended Complaint alleges that Trinity "misrepresent[ed] the nature, characteristics, qualities, or geographic origin of Chefs Trading's services or commercial activities . . . ."[100]

At the outset, the Court notes that the precise language of the Lanham Act is not a tight fit for the violation alleged here.   It is awkward, to say the least, to speak of Trinity as "using" a "word, term, name, symbol, or device, or any combination thereof," "using" a "false designation of origin," "using" a "false or misleading description of fact," or "using" a "false or misleading representation of fact."[101]   After all, the alleged wrong identified by Chefs Trading is actually the cutting and removal of—i.e., not using—the tags.   Notwithstanding the text of the statute, Chefs Trading argues that Trinity has violated the Lanham Act by engaging in what courts have called "reverse palming off" (also known as "reverse passing off").[102]   And, to be fair, Chefs Trading is correct to make this argument; precedent from an era more disposed to purposivism than textualism has adopted reverse palming off or reverse passing off as an addendum to the explicit language of the Lanham Act.

"Reverse palming off" or "reverse passing off" is when a "producer misrepresents someone else's goods or services as his own."[103]   The Eighth Circuit has acknowledged reverse palming off as a viable theory for Lanham Act violations.[104]   However, the Eighth Circuit has done so in cases where the reverse palming off or reverse passing off is express—that is, where there is some affirmative misrepresentation.   It has yet to do so in cases of implied reverse palming off or implied

---

[99] *Id.*

[100] *Id.*

[101] 15 U.S.C. § 1125(a)(1).

[102] Pl.'s Resp. in Opp'n to Mot. to Dismiss (Doc. 18) at 16.

[103] *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003).

[104] *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1241 (8th Cir. 1994).

reverse passing off—where the misrepresentation arises from the silence of the allegedly bad actor.[105]  The same goes for the Supreme Court.

The theory of implied reverse palming off or implied reverse passing off is yet another step removed from the language of the Lanham Act.  But whether implied reverse passing off or implied reverse palming off is a step too far is not a question the Court must resolve at the moment.  Even if such a theory where viable, Chefs Trading's claim would still fail.  That's because all the Amended Complaint really alleges is that Trinity removed Chefs Trading's tags before reselling the fish.  The Amended Complaint does not allege any facts about how or where Trinity sells the fish.  There are no facts alleged about how or if the fish is re-packaged and what information is on the re-packaging.  There are no facts to show that the way Trinity sells the fish misrepresents or falsifies anything to anyone (or tries to do so).  Indeed, as described in detail in the Background Section, the Amended Complaint's own allegations indicate that Trinity did not misrepresent Chefs Trading's goods or services as its own.  The Amended Complaint repeatedly states that Trinity affirmatively disclosed in presentations to its customers and potential customers that Trinity sourced its fish from Chefs Trading and repeatedly explained the benefits of Chefs Trading's tags.

It is unclear why Trinity cut off the tags off the fish after promoting them in its marketing efforts.  Whatever the reason, the Court cannot conclude that the mere cutting off of the tags constitutes a Lanham Act violation.  Chefs Trading did not provide any facts regarding Trinity's representations to its customers—express or implied—after cutting off the tags.  The Court will

---

[105] In a case cited by the Eighth Circuit, the Ninth Circuit approved of an "'implied' reverse palming off" theory where "the wrongdoer simply removes or otherwise obliterates the name of the manufacturer or source and sells the product in an unbranded state."  *Smith v. Montoro*, 648 F.2d 602, 605 (9th Cir. 1981), *cited in Pioneer Hi-Bred Int'l*, 35 F.3d at 1241.  The Eighth Circuit case that cited *Montoro*, however, involved a defendant who "violated the Lanham Act by reverse palming off [the plaintiff's product] <u>as its own</u>" through intentional marketing conduct.  *Pioneer Hi-Bred Int'l*, 35 F.3d at 1242 (emphasis added).

not speculate as to whether any misrepresentations may have occurred when Trinity delivered or otherwise sold the fish to customers.

For similar reasons, Chefs Trading's common law unfair competition claim fails.  Chefs Trading alleges that Trinity's conduct constitutes common law unfair competition because it "misappropriates Plaintiff's goodwill, reputation and expertise as a FDA-approved, FIP-certified provider and/or sourcing entity of tuna and other seafood from Costa Rica."[106]  As Trinity notes, to satisfy Rule 9(b) of the Federal Rules of Civil Procedure, "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result."[107]  Chefs Trading fails to specifically allege how Trinity "misappropriates Plaintiff's goodwill, reputation and expertise" or otherwise makes false representations, especially when its own allegations demonstrate that Trinity told its customers that its fish came from Chefs Trading.  Rule 9(b) requires more than simply "the tags were cut."

CONCLUSION

It is, therefore, ORDERED that:

1.      Chefs Trading's claim of unfair competition in violation of 15 U.S.C. § 1125[108] is DISMISSED without prejudice;

2.      Chefs Trading's claim of unfair competition in violation of Arkansas common law[109] is DISMISSED without prejudice;

---

[106] Pl.'s Am. Compl. (Doc. 15) at 18.

[107] Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 17) at 22 (quoting *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006)).

[108] Pl.'s Am. Compl. (Doc. 15) at 14.

[109] *Id.* at 18.

3.      Chefs Trading's claim of breach of contract[110] is DISMISSED with prejudice;

4.      Chefs Trading's claim of unjust enrichment[111] is DISMISSED with prejudice; and

5.      Chefs Trading may file an Amended Complaint within 30 days of the date of this Order if it can allege sufficient additional facts to state a claim under the Lanham Act or a claim for unfair competition under Arkansas common law.[112]   If an Amended Complaint is not filed within 30 days, a judgment of dismissal will be entered in this case.

IT IS SO ORDERED this 23rd day of March 2021.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[110] *Id.*

[111] *Id.* at 21.

[112] Because the Court holds that Chefs Trading failed to state any viable claims, the Court does not reach the statute of limitations issue at this time.